Richard N. ALBER, Appellant,

v.

NORFOLK AND WESTERN RAILWAY COMPANY, Appellee.

No. 80–1379.

United States Court of Appeals, Eighth Circuit.

Submitted May 21, 1981.

Decided Aug. 3, 1981.

Richard Alber, pro se.

Robert D. Tucker, Schoenbeck, Tucker & Schoenbeck, St. Louis, Mo., for appellee.

Before LAY, Chief Judge, GIBSON, Senior Circuit Judge, and HEANEY, Circuit Judge.

HEANEY, Circuit Judge.

Richard N. Alber appeals the district court's dismissal of his action under the Vietnam Era Veterans' Readjustment Assistance Act, 38 U.S.C. § 2021 *et seq.* (VEVRA). We reverse and remand for further proceedings. 489 F.Supp. 654.

### I

Alber began working for Norfolk & Western Railway Company (N & W) on September 21, 1965, as a file clerk. On July 15, 1966, he was drafted into the armed forces and given a leave of absence by N & W. Alber was discharged by the military with a certificate of satisfactory service on July 19, 1968, and returned to employment at N & W on July 23, 1968. On the date Alber returned, N & W permitted him to exercise his seniority date of September 21, 1965, and take any position in the St. Louis accounting department which was held by an employee junior to him on the seniority roster at the time of his return. Shortly after his return to work, Alber voluntarily transferred to the N & W's engineering department in St. Louis; the new position paid less than the accounting department position which Alber assumed upon his return from military service. Alber worked in N & W's engineering and accounting departments until he was furloughed in 1977 because of a reduction in force.

Alber's claims for benefits under VEVRA are based on a series of written labor agreements. First, a 1953 collective bargaining agreement between the Wabash Railroad Company[1] and its employees required N & W to bulletin new positions or vacancies in accessible places so employees could bid for the assignment. That agreement required that employees returning from an absence longer than thirty days must be given the option of: (1) returning to their former position (provided the position had not been abolished or that the employee had not been displaced from that position by a senior employee); or (2) exercising seniority rights on "any position * * * bulletined during his absence."[2]

Seniority and promotion is governed by Rule 15 of the 1953 Agreement. The district court stated that, under Rule 15, "seniority rights were to be exercised within geographically defined seniority districts." *Alber v. Norfolk & Western Railway Co.*, 489 F.Supp. 654, 655 (E.D.Mo.1980). We cannot agree that the Rule's language requires that conclusion.[3] Moreover, other

1. On October 16, 1964, the Norfolk & Western Railway Company, the Wabash Railway Company, and several other railroad companies merged to form the Norfolk & Western Railway Company as it presently exists. The 1953 collective bargaining agreement—as well as subsequently executed merger protection agreements discussed *infra*—applies to Alber.

2. In addition, and not mentioned by the district court, that agreement also provided that an employee returning after a leave of absence "may return to former position, or may upon return, or within three (3) days thereafter, exercise seniority rights to any position bulletined during such absence." N & W concedes that Alber was given a leave of absence to serve in the military.

3. Rule 15 provides in relevant part:

SENIORITY AND PROMOTION

(a) Clerks shall be considered in line for promotion on the Superintendent's Division or in the classified departments of the General Offices in which they are employed.

There shall be a separate seniority roster for the Accounting Department and a sepa-

rate seniority roster for the Freight Claim Department of the General Offices, which shall include only the machine operators in that department, such as operators of Dictaphones, Comptometers, Adding and other computing machines.

\* \* \* \* \* \*

The Superintendent's Division seniority roster, as herein provided, shall not include Division Freight and Passenger Offices other than the Division Freight and Passenger Offices at Fort Wayne, Decatur, Springfield, Hannibal, Quincy and Moberly.

*Promotion shall be based on seniority, fitness and ability,* except as provided for in Paragraph (f) of Rule 1. *Fitness and ability being sufficient, seniority shall prevail.*

(c) *Employees declining promotions, or declining to bid for a bulletined position, shall not lose their seniority.* [Emphasis added.]

The first paragraph of Rule 15(a) might conceivably be read to impose some sort of a geographical-seniority-limitation. However, the Rule goes on to describe a seniority district that crosses several geographical lines. Accordingly, we cannot agree that the district

provisions of the 1953 Agreement, not mentioned by the district court, expressly permit employees to: (1) bid on all bulletined positions, including more than one position at a time; (2) apply for positions bulletined in other districts or on other rosters; and (3) retain their positions and seniority when transferred with their positions from one seniority district or roster to another.

A second series of agreements were executed when several railroad companies were merged in 1964 to form the N & W. *See* n.1, *supra.* An April 17, 1965, Memorandum Agreement bound N & W and its employees' union to execute an implementing agreement providing for the transfer and use of employees and the allocation or rearrangement of forces made necessary by the merger. The implementing agreement, dated December 2, 1965, allowed N & W to transfer clerical positions throughout its rail system.[4] Employees who elected not to transfer with their positions were given a protected "utility status" that granted them a minimum pay rate of no less than the position transferred and permanent protection from layoffs.

The implementing agreement was superceded by an April 29, 1976, agreement. The latter agreement provided, in part, that protected employees could resign their positions in writing before May 31, 1976. In return, and in lieu of all other benefits and protections accorded them, the employees would receive a lump sum separation allowance from N & W.

Alber's legal claims were summarized by the district court as follows:

On July 15, 1966, Alber was drafted into the Armed Forces and was given a leave of absence by defendant. During Alber's service [absence] Norfolk bulletined several positions in its St. Louis seniority district for bids by employees, including the Interline Clerk position. The position was filled by Evans, an employee junior in seniority to Alber. On August 1, 1967, prior to plaintiff's return from the service, the position was transferred to Virginia. Evans elected not to transfer to Virginia and thus became a "protected" utility employee under Memo 1965. *When Alber returned to Norfolk from the service on July 23, 1968, he was offered a choice of positions from among those then available in the St. Louis seniority district.* Alber was not offered the Interline Clerk position or Evans' utility status. Plaintiff chose the highest listed position offered.

On May 1, 1976, Memo 1976 canceled Memo 1965 and granted transfer protected employees a lump sum severance allowance if they would resign on or before May 31, 1976. *Alber offered to resign on May 7, 1976, claiming transfer protection on the theory that had he been able to bid on the bulletin for Interline Switching Clerk during his military service he would have received that position and its subsequent transfer protection.* Norfolk denied plaintiff's claim and this suit followed.

*Alber v. Norfolk & Western Railway Co.,* *supra,* 489 F.Supp. at 655–656 (emphasis added).

The district court entered judgment for N & W on two alternative grounds: (1) Alber's claims were barred by the doctrine of laches; and (2) on the merits, there was no violation of VEVRA or the labor agreements. In our view, neither ground supports the judgment of the district court.

## II

The district court ruled that Alber "inexcusably delayed" bringing suit, and that that delay prejudiced N & W. The court stated that upon his return from military service in 1968, "Alber asserted neither statutory reemployment rights nor [1953] Contract Rule 17(b) rights (to bid upon all positions posted in his absence) in spite of Union representation." It also recognized

---

court's characterization of Rule 15(a) necessarily follows from its language. However, our disagreement on this point is not essential to our holding.

4. The December 2, 1965, agreement expressly referred to N & W's accounting departments at Roanoke, Virginia, Cleveland, Ohio, and St. Louis, Missouri.

that VEVRA is liberally construed and that laches is to be applied sparingly in VEVRA cases. Finally, it conceded that Alber's suit was brought primarily to recover a benefit (a lump sum separation allowance) first made available in 1976. Nevertheless, the district court concluded that the laches doctrine barred Alber's suit. It reasoned:

This Court finds, however, that the lump sum severance here sought is simply one of a series of compensatory rights offered employees affected by merger transfers, and that plaintiff's interest in merger protection benefits is quite belated. There has been no claim that plaintiff, who began working for Norfolk approximately two months before merger protection became available, did not know of those special benefits when he left for the service in 1966. Plaintiff's claim that Norfolk had a duty to inform Alber of his statutory rights does not explain why Alber did not seek contractual merger protection rights in other forms over the eleven years prior to this suit.

*Alber v. Norfolk & Western Railway Co., supra,* 489 F.Supp. at 656.

The district court determined that Alber's "delay in seeking merger protection status" neutralized the ability of either the defendant or the trial court to examine Alber's assertion that he would have bid on the Interline Switching Clerk position which opened during his absence. Thus, the district court based its laches ruling on a conclusion that the eight-year time lapse resulted in a loss of available and necessary evidence.

 Although the existence of laches is a question primarily addressed to the trial court's discretion, its decision is not "unfettered by appropriate standards or shielded from thorough appellate review." *Goodman v. McDonnell Douglas Corp.*, 606 F.2d

800, 804 (8th Cir. 1979), *cert. denied*, 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980). We conclude that the district court abused its discretion in applying the doctrine of laches.

Upon his return from military service, N & W offered Alber only those positions which were *presently available* in the St. Louis seniority district. It is clear that Alber was not offered any positions which were bulletined during his absence and it is equally clear that the 1953 Agreement made all positions bulletined during Alber's military absence open to bidding upon his return. In our judgment, N & W had an affirmative contractual duty to inform Alber of all positions bulletined during his absence.[5] Therefore, any prejudice, *i. e.*, loss of evidence relating to whether Alber *would have* selected a particular bulletined position, resulting from the eight-year time passage was solely attributable to N & W.

Moreover, on May 7, 1976, Alber offered to resign in return for a lump sum separation allowance. The option to resign for a lump sum severance allowance was first offered in the April 29, 1976, agreement. Indeed, the district court recognized that the lump sum benefit first became available in 1976. Alber contends that it was not until 1976 that he learned that persons junior to him had obtained protected status during his military absence which entitled them to the lump sum option. N & W does not contend that it informed Alber of the previously bulletined positions. We find Alber's contention persuasive. In short, the district court required too much of Alber, and these facts do not support its application of the laches defense. We hold, therefore, that the laches doctrine does not bar Alber's suit.

---

5. Where, as here, the returning veteran has a clear contractual right to bid on positions bulletined during his absence, it is manifestly just to impose a duty of disclosure upon the employer. Moreover, the remedial nature of VEVRA buttresses our conclusion that N & W had a duty to inform Alber of all the positions bulletined during his absence.

Of course, the union may have some responsibility in this area and the employee-veteran might be required to have some knowledge of the collective bargaining agreement. Nevertheless, the employer is in the best position to provide appropriate and complete information to a returning veteran.

## III

■ The operative provision of VEVRA is 38 U.S.C. § 2021. In *Coffy v. Republic Steel Corp.*, 447 U.S. 191, 100 S.Ct. 2100, 65 L.Ed.2d 53 (1980), the Supreme Court stated:

> The Vietnam Era Veterans' Readjustment Assistance Act of 1974 (Act), 38 U.S.C. § 2021 *et seq.*, requires that returning veterans be reinstated to the jobs they left for military service "or to a position of like seniority, status, and pay." § 2021(a)(B)(i). The Act further provides that the veteran be reinstated "without loss of seniority." § 2021(b)(1). We interpreted the predecessor of § 2021 to mean that *the returning veteran "does not step back on the seniority escalator at the point he stepped off. He steps back at the precise point he would have occupied had he kept his position continuously during the war." Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 284–285 [66 S.Ct. 1105, 1111, 90 L.Ed. 1230] (1946). Congress incorporated this principle into the present statute by providing that any person reinstated under the Act should be given "such status in the person's employment as the person would have enjoyed if such person had continued in such employment continuously" during the period of military service. § 3031(b)(2). *The statute is to be liberally construed for the benefit of the returning veteran.*

*Id.* at 195–196, 100 S.Ct. at 2104 (citation and footnotes omitted, emphasis added).

The majority of cases construing this section turn on whether a particular type of benefit is a "perquisite of seniority" to which a returning veteran is entitled under VEVRA. *Coffy* ruled that the test for determining whether a benefit is a "perquisite of seniority" under VEVRA is two-pronged. First, there must be a *reasonable certainty* that the benefit would have accrued if the employee had not gone into military service. Second, the nature of the benefit must be a reward for length of service rather than a form of short-term compensation for services rendered. 447

U.S. at 197–198, 100 S.Ct. at 2105. *See also Alabama Power Co. v. Davis*, 431 U.S. 581, 589, 97 S.Ct. 2002, 2007, 52 L.Ed.2d 595 (1977).

Most factually similar to the instant appeal is *McKinney v. Missouri-Kansas-Texas Railroad Co.*, 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958). There, employees were divided into three distinct seniority groups. The relevant collective bargaining agreement required the employer to bulletin vacant positions in order to allow employees to bid on those positions. It also provided that promotions would be confined to each seniority group, except that "group two" employees would be given preference over nonemployees for assignments to "group one" positions based on fitness and ability. Finally, the collective bargaining agreement expressly allowed an employee returning from a leave of absence to exercise seniority rights on any position bulletined during such absence.

Before leaving for military service, McKinney held a "group two" position. Upon his return, he was elevated to a "group one" position. He was later transferred to a "group two" position when the elevated position was abolished. McKinney complained that two separate "group one" positions were bulletined in his absence and assigned to nonemployees. When the employer refused to allow McKinney to exercise seniority rights of displacement so as to secure a "group one" position filled by a nonemployee during his absence, he filed suit. The essence of McKinney's complaint was described by the Court in this manner:

> In the District Court petitioner contended that the group 1 seniority date assigned him on re-employment, October 7, 1952, was erroneous and that under § 9 of the Universal Military Training and Service Act, *supra*, he was entitled to a seniority date of September 8 or September 10, 1952, *the dates on which, if he had then been employed by respondent, he could have applied for the bulletined group 1 positions. Such a seniority date, according to petitioner, would have entitled him to replace the nonemployee as*

*bill clerk when the position of assistant-cashier was abolished, and thus avoided reduction to group 2.*

357 U.S. at 267–268, 78 S.Ct. at 1224–1225 (emphasis added).

The Court held that McKinney was not entitled to either of the two earlier seniority dates because both "group one" positions depended "not simply on seniority or some other form of automatic progression, but on the exercise of discretion on the part of the employer." *Id.* at 272, 78 S.Ct. at 1227. The Court, however, granted McKinney leave to amend his complaint to show, if possible, that by custom and practice under the collective bargaining agreement "he would necessarily have been assigned to the group 1 position of bill clerk or assistant cashier had he remained continuously in respondent's employ." *Id.* at 273, 78 S.Ct. at 1227.[6]

Finally, and despite the district court's contrary declarations, it is clear that cross-craft orders (position changes between entirely separate labor crafts) and transfer orders (opportunities to transfer from one position to another) are proper remedial devices under VEVRA. *Barrett v. Grand Trunk Western Railroad Co.*, 581 F.2d 132, 137 (7th Cir. 1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1423, 59 L.Ed.2d 634 (1979). As a result, the fact that the Interline Clerk position was transferred to Virginia does not automatically defeat Alber's claims. In *Barrett*, the Seventh Circuit recognized that while it may be difficult to determine "what would have been," VEVRA simply requires that there be a reasonable certainty that the veteran would have enjoyed the status he claims but for his military service. This is the proper legal standard and the district court did not apply it.

The district court here, in denying relief on the merits, found neither a violation of VEVRA nor of the applicable collective bargaining agreements. The court stated:

This Court finds that under the VEVRA "escalator principle," 38 U.S.C. § 2021(b)(2), the right to bid upon bulletined positions was not a status of seniority to which plaintiff was entitled upon return from the service. The bulletins posted pursuant to Contract Rule 17 are neither direct offers for promotion nor company solicitation of employee applicants * * *. The act in this case of bidding upon a position is to be distinguished from cases where an employee has already taken affirmative steps toward promotion and the remaining steps occur *automatically,* * * * or cases where a benefit accrues without affirmative steps by the employee * * *. While there was persuasive testimony that seniority is a decisive factor in selecting the successful bidder for a position, there was no evidence that seniority in any way governs submission of a bid or that Norfolk plays any role in soliciting bidders for a bulletin. * * * Thus, this Court finds that the right to bid upon bulletins is a right separate and distinct from the benefits of seniority, and that plaintiff is not seeking a status within VEVRA.

*Id.* at 657 (emphasis added and citations omitted).

We cannot agree with the court's characterization of N & W's bulletin and bidding system. Like *McKinney v. Missouri-Kansas-Texas Railroad Co., supra*, Alber had the right upon his return to exercise seniority rights over positions bulletined during his military absence. N & W neither affirmatively informed Alber of the positions bulletined during his absence nor made such information available to him. The right to bid upon bulletined positions directly arose under the 1953 contract and from Alber's seniority status. The proper inquiry, therefore, is whether it would have

---

**6.** As previously discussed, the Supreme Court subsequently lessened the veteran's burden of proof under the Act. In *Tilton v. Missouri Pacific Railroad Co.*, 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed.2d 590 (1964), the Court noted that *McKinney* did not establish a requirement of absolute foreseeability of automatic advance-ment. Rather, the veteran need only show that it was reasonably certain that advancement would have occurred by virtue of continued employment but for his military absence. *Id.* at 179–181, 84 S.Ct. at 601–602; *see Coffy v. Republic Steel Corp.*, 447 U.S. 191, 197–198, 100 S.Ct. 2100, 2105, 65 L.Ed.2d 53 (1980).

been reasonably certain that Alber would have obtained the claimed status but for his military absence. The district court's failure to apply this legal test requires reversal.

The district court also ruled, as a matter of contract construction, that Alber, upon his return, had no right to bid for positions which had been transferred to another seniority district or for positions which ultimately evolved into utility status. The court stated that the contract did not expressly cover these two circumstances.

■ Although it is true that the contract is silent with regard to these two situations, the court's focus was errant. First, no practice of employers or agreements between employers and unions can diminish the service adjustment benefits which Congress has secured the veteran under VEVRA. *See Hembree v. Georgia Power Co.,* 637 F.2d 423, 429 (5th Cir. 1981); *accord, Accardi v. Pennsylvania Railroad Co.,* 383 U.S. 225, 229, 86 S.Ct. 768, 771, 15 L.Ed.2d 717 (1966) (predecessor statute). Therefore, a particular contract interpretation cannot defeat the veteran's statutory rights under VEVRA. Moreover, as noted earlier, the district court erred by failing to apply the "reasonable certainty" test to Alber's claims of "what would have been" but for his military absence.

The evidence below indicated that some sixteen positions [7] were bulletined during Alber's absence and that although fitness and ability were considered, bulletined positions were virtually always awarded on the basis of seniority. Moreover, N & W contends that Alber, before entering military service, did not bid on several higher-paying positions which were bulletined and later awarded to junior employees. Indeed, Alber voluntarily transferred to a lower paying position in the engineering department after his return. These facts should be expressly considered by the district court upon remand when it reviews the case under the proper legal standard.

At this juncture, we simply cannot determine whether Alber's claim for the Interline Clerk position, or any other position, satisfied the "reasonable certainty" test. N & W logically argues that Alber should not be allowed to use hindsight to pick a particular position out of the sixteen positions bulletined during his absence. While *McKinney v. Missouri-Kansas-Texas Railroad Co., supra,* 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305, may be considered contrary to N & W's argument, only two positions opened during the veteran's absence in that case. As a result, the hindsight selection possibilities there were less complex. The facts in the instant case are particularly complicated, but the district court must nevertheless apply them to the proper legal framework before it may pass on the merits of Alber's claims.

The order of the district court is reversed, and the matter is remanded for further proceedings consistent with this opinion.

FLOYD R. GIBSON, Senior Circuit Judge, dissenting.

I believe that the record and the district court's factual findings conclusively establish that Alber failed to demonstrate "a reasonable certainty that the benefit [of the Interline Clerk position] would have accrued if the employee had not gone into military service." *Coffy v. Republic Steel Corp.,* 447 U.S. 191, 197, 100 S.Ct. 2100, 2105, 65 L.Ed.2d 53 (1980); *see Alabama Power Co. v. Davis,* 431 U.S. 581, 589, 97

---

**7.** Alber disputes whether there were actually sixteen distinct position openings during his absence, and maintains that five of the sixteen are duplicates. Moreover, Alber contends that: (1) all of the positions bulletined during his absence were either filled by senior employees or transferred to Virginia; (2) all of the positions would have entitled him to a lump sum severance allowance; and (3) he "would certainly have chosen" one of the higher positions bulletined during his absence. As a result, Alber apparently does not limit his claim solely to the Interline Clerk position. The present record, however, does not permit us to adequately evaluate these contentions.

Since the district court does not state whether these arguments were considered, it is directed to specifically address these contentions on remand.

S.Ct. 2002, 2007, 52 L.Ed.2d 595 (1977). I therefore dissent.

In order to establish that the Interline Clerk position was a perquisite of employment under 38 U.S.C. § 2021(b)(1)(2) (1976), Alber must demonstrate with a "reasonable certainty" that the following sequence of events would have occurred had he not been drafted into military service: 1) that he would have bid on the Interline Clerk position when it opened up in 1967; 2) that Norfolk & Western would have promoted him to that position; 3) that he would have turned down the transfer to Virginia in 1967 and thus obtained "utility" status; and 4) that he would have resigned prior to May 31, 1976, and thus obtained a lump-sum separation allowance. The district court made the following factual findings with regard to this question:

> This Court must find for plaintiff if his progression to Interline Switching Clerk would have been a reasonably foreseeable event had he not entered the Armed Forces. *Alabama Power v. Davis*, 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977). The foreseeability of plaintiff's progression is, under the Contract bid system, largely a question of Alber's subjective intent to take the affirmative steps necessary to bid for the position and to remain in St. Louis after the position was transferred. Alber's delay has reduced his claim to a swearing contest

inasmuch as these crucial issues must be decided without corroborating witnesses or evidence. It is not at all clear from the record that Alber would have bid upon the position of Interline Clerk, or that if he had bid upon and accepted the Position he would have remained in St. Louis rather than transfer to Virginia. Plaintiff's self-serving assertions that he would have bid upon the Position and have remained in St. Louis are no more helpful than Norfolk's evidence that Alber did not bid upon certain qualitatively unknown bulletins prior to military service.

*Alber v. Norfolk & Western Railway*, 489 F.Supp. 654, 656–57 (E.D.Mo.1980).

The majority opinion, however, overlooks these factual findings and reverses the district court on the ground that it failed to apply the legal test of "whether it would have been reasonably certain that Alber would have obtained the claimed status but for his military absence." *Ante* at 13. The district court opinion, as quoted above, *ante* at 16, clearly reveals that the district court did apply this test. The district court, however, erred in relying upon these findings in concluding that Alber's claim was barred by the doctrine of laches. *Alber v. Norfolk & Western*, 489 F.Supp. at 657; *ante* at 1275. The findings, nonetheless, bar Alber's claim on the merits.[1] The crucial decisions by

---

1. In *McKinney v. Missouri-Kansas-Texas Railroad*, 357 U.S. 265, 271–72, 78 S.Ct. 1222, 1226–1227, 2 L.Ed.2d 1305 (1958), the Supreme Court in a similar case involving a predecessor statute to 38 U.S.C. § 2021, stated the following:

 > However, § 9(c) does not guarantee the returning serviceman a perfect reproduction of the civilian employment that might have been his 'f he had not been called to the colors. Much there is that might have flowed from experience, effort, or chance to which he cannot lay claim under the statute. Section 9(c) does not assure him that the past with all its possibilities of betterment will be recalled. Its very important but limited purpose is to assure that those changes and advancements in status that would necessarily have occurred simply by virtue of continued employment will not be denied the veteran because of his absence in the military service. The statute manifests no purpose to

 give to the veteran a status that he could not have attained as of right, within the system of his employment, even if he had not been inducted into the Armed Forces but continued in his civilian employment.

 > Thus, on application for re-employment a veteran is not entitled to demand that he be assigned a position higher than that he formerly held when promotion to such a position depends, not simply on seniority or some other form of automatic progression, but on the exercise of discretion on the part of the employer.

 Alber therefore had the burden of proof to establish by a preponderance of the evidence that it was reasonably certain that the four-event sequence over a period of ten years would have occurred had he not been drafted. The law does not allow Alber to sit back and wait for the events to unfurl and then "Monday morning quarterback" his way into the most advantageous financial position.

Alber would have had to be made by him long prior to the establishment of the lump-sum separation allowance in May 1976.

I also dissent from the majority's conclusion that the railroad "had an affirmative contractual duty to inform Alber of all positions bulletined during his absence." *Ante* at 8 (footnote omitted). Neither the contract nor VEVRA requires such an extraordinary duty. In large corporations or in the federal government, the paperwork involved in developing and maintaining a nationwide list would be titanic. *See Vaughn v. Westinghouse Electric Corp.*, 620 F.2d 655, 662 (8th Cir. 1980) (Gibson, J., dissenting), *vacated and remanded,* 450 U.S. 972, 101 S.Ct. 1504, 67 L.Ed.2d 808 (1981). VEVRA does not require employers to affirmatively provide preferential treatment for veterans. *See Monroe v. Standard Oil Co.*, —— U.S. ——, ——, 101 S.Ct. 2510, 2517, 69 L.Ed.2d 226 (1981) (construing 38 U.S.C. § 2021(b)(3)).

Finally the record reveals that Alber did not remain in the accounting department at the railroad upon his return from military service in 1968. Shortly after having chosen the highest available accounting position, Alber decided to transfer into the engineering department at a lower wage rate. It is therefore highly unlikely, and definitely not a "reasonable certainty," that Alber would have continued as an Interline Clerk had the position been offered. Accordingly, I would affirm the district court.